ORIGINAL

1   FOX, WANG & MORGAN P.C.
    JOHN C. FOX (Bar No. CA 135668)
2   E-mail: JFox@foxwangmorgan.com
    ALEXA L. MORGAN (Bar No. CA 234911)
3   E-mail: AMorgan@foxwangmorgan.com
    160 W. Santa Clara St.
4   San Jose, CA 95113          E-filing
    Telephone: (408) 844-2350
5   Facsimile: (408) 844-2351

FILED

2011 NOV 30

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NO. DIST. OF SAN JOSE

6   Attorneys for Plaintiff
    THE INSTITUTE OF MEDICAL EDUCATION
7                                          ADR

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12  THE INSTITUTE OF MEDICAL          CV 11-05755 PSG
    EDUCATION, INC.,                  No.

13          Plaintiffs,               **COMPLAINT FOR:**
                                      **(1) DENIAL OF COMMON LAW DUE**
14      vs.                           **PROCESS;**

15  WESTERN ASSOCIATION OF            **(2) BREACH OF CONTRACT;**
    SCHOOLS AND COLLEGES, and DOES    **(3) BREACH OF THE IMPLIED**
16  1 THROUGH 10 INCLUSIVE,           **COVENANT OF GOOD FAITH AND FAIR**
                                      **DEALING;**
17          Defendant.                **(4) INTENTIONAL INTERFERENCE**
                                      **WITH CONTRACT;**
18
                                      **(5) NEGLIGENT INTERFERENCE WITH**
19                                    **PROSPECTIVE BUSINESS OR**
                                      **ECONOMIC ADVANTAGE; AND**
20
                                      **(6) PROMISSORY ESTOPPEL**
21
22                                    **DEMAND FOR JURY TRIAL**

23

24      Plaintiff, the Institute of Medical Education ("IME" or "Plaintiff"), by and through

25  counsel, for its Complaint against Defendant, Western Association of Schools and Colleges

26  ("WASC" or "Defendant"), states the following:

27  //

28

                                1

**NATURE OF ACTION**

1.      This is an action for damages against WASC and Does 1 through 10 for claims arising out of Defendant's breach of contact.

**THE PARTIES**

2.      Plaintiff IME is a Delaware corporation with its principal place of business in San Jose, California.  IME operates a post-secondary vocational school, which offers vocational medical programs in fields such as dental hygiene, nursing, medical assisting, phlebotomy, and MRI technology on campuses in San Jose and Oakland, California.  Founded in 2003, IME has a 2011 enrollment of approximately 600 students, and it has 92 employees.

3.      Defendant WASC is a 501(c)(3) organization encompassing three Commissions: The Accrediting Commission for Schools; The Accrediting Commission for Community and Junior Colleges; and The Accrediting Commission for Senior Colleges and Universities.  WASC has commission offices in Burlingame, California; Novato, California; and Alameda, California. WASC is recognized as one of six regional associations that accredit public and private schools, colleges, and universities in the United States.  All three Commissions share the name "WASC" and function under a single Constitution.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of this action under the following statutory provisions: (a) 28 U.S.C. section 1331 in that this is a civil action arising under the Constitution and laws of the United States, including federal common law; (b) 20 U.S.C. section 1099b(f), providing exclusive federal jurisdiction for disputes with recognized accrediting agencies.

**FACTUAL BACKGROUND**

5.      IME operates a post-secondary vocational school, which offers students vocational medical programs in fields such as dental hygiene, nursing, medical assisting, phlebotomy, and MRI technology on campuses in San Jose and Oakland, California.

6.      IME's students are currently eligible to receive funding from federal student aid programs under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. section

1070, et seq. ("Title IV funding"), which is administered by the United States Department of

Education ("USDOE").  Almost all of IME's students receive Title IV funding, and

approximately 80 percent of the institution's revenue originates from this source.

      7.      To be eligible to participate in Title IV programs, a postsecondary educational

institution must be accredited by an accrediting agency that is recognized by the USDOE.

      8.      In addition, in order for IME to offer medical vocational programs to its students,

each program that IME offers must be accredited by a field-specific accrediting agency.  Each of

these field-specific accrediting agencies requires that IME be accredited by an accrediting agency

that is recognized by the USDOE.

      9.      For example, IME's Dental Hygiene program is currently accredited by the

Commission on Dental Accreditation ("CODA").  To obtain accreditation from CODA, CODA

requires that IME be accredited by a USDOE-approved accrediting agency.

      10.      Without accreditation from a USDOE-approved accrediting agency, IME cannot

obtain accreditation from field-specific accrediting agencies like CODA.  Further, without

accreditation from the field-specific agencies, IME cannot offer the programs that it currently

offers to its students.

      11.      In June 2007, IME received its initial accreditation from WASC's Accrediting

Commission for Schools ("WASC ACS"), which was scheduled to expire in June 2010.

      12.      IME then received its Title IV eligibility in October 2008.

      13.      Beginning in approximately June 2009 IME began to engage in the process of

renewing its accreditation with WASC ACS.  The WASC ACS accreditation renewal process is a

lengthy one that involves 1) an Institutional Accreditation Workshop; 2) creation and submission

of a Self Evaluation Report; 3) attendance at the New Process Workshop; 4) an initial one-day

on-site visit from WASC; and 5) a two-day follow-up on-site visit from WASC.  The renewal

process takes approximately one year.

      14.      After IME submitted its renewal application, WASC ACS issued IME a letter, on

July 7, 2010, stating that it was renewing IME's accreditation for six years (until June 30, 2016).

*See* **Exhibit ("Exh.") A**.  The renewal letter stated that the renewal was issued "after a careful

study of the Visiting Committee Report, which noted the stellar aspects of [IME]." At the time WASC ACS issued its July 7, 2010 letter, WASC ACS was a USDOE-approved accrediting commission.

15.     On September 23, 2010, IME received another letter from WASC ACS verifying that 23 of IME's programs were accredited by WASC ACS. *See* **Exh. B**. While a number of the programs listed in this letter were programs that IME already offered to its students, some of these programs, such as the Registered Nursing Program and the Physical Therapy Assistant Program, were intended to be new programs that IME would offer to its students.

16.     To receive and retain accreditation from WASC ACS, IME complied with the rules and requirements described in WASC's Constitution ("Constitution"). *See* **Exh. C**. The Constitution reflects the terms of the parties' relationship and gives rise to obligations that both WASC and IME are required to follow. Among other things, the Constitution specifically provides for due process procedures for the "Accrediting Commission's denial or termination of candidacy or accreditation." *Id.* at Article IV.

17.     Relying on the letters it had received from WASC ACS, IME continued to offer its programs to its students and began to take steps to establish its new Registered Nursing and Physical Therapy Assistant programs.

18.     Specifically, in approximately August 2010, IME signed a seven-year lease for real estate space to accommodate the Registered Nursing Program and the Physical Therapy Assistant Program. IME is currently paying approximately $27,800 a month for this space. In addition IME purchased approximately $250,000 in equipment and furniture for these programs.

19.     On November 3, 2010, IME received a letter from WASC ACS notifying it that WASC ACS had withdrawn from the Title IV compliance process with the USDOE as of October 26, 2010. *See* **Exhibit D.**

20.     IME is informed and believes that the WASC ACS voluntarily withdrew from the USDOE's Title IV compliance process because it did not want to change various aspects of its policies and practices to comply with the USDOE's regulations. **Exh. D.**

4

21.    As a result of WASC ACS's decision to withdraw from the USDOE's Title IV compliance process, IME must obtain accreditation through an alternate agency to maintain its Title IV funding.  The USDOE has given IME only 18 months from October 26, 2010 to obtain alternate accreditation.

22.    Further, and more importantly, as a result of WASC ACS's decision to withdraw from the USDOE's Title IV compliance process, IME was no longer accredited by a USDOE-approved accrediting commission as of October 26, 2010.

23.    IME was not provided with meaningful notice, which would allow it to obtain alternate accreditation from a USDOE-approved agency, in advance of this decision; nor was IME given the chance to appeal this decision pursuant to the due process standards provided in the Constitution.

24.    This immediate loss of accreditation from a USDOE-approved agency has had a severe impact on IME.  First, as a result of this loss of accreditation, IME was not able to offer its Registered Nursing, Physical Therapy Assistant, and Medical Lab Technician programs since these programs require that IME be accredited through a USDOE-approved accrediting agency.  As a result of IME's inability to start/continue these programs, IME has already incurred over a million dollars in damages.

25.    In addition to the above, certain field-related accrediting commissions for IME's current programs are threatening to withdraw their accreditation of IME's programs.  Specifically, IME offers a Dental Hygiene Program that is accredited through the Commission on Dental Accreditation ("CODA").  IME cannot offer a Dental Hygiene program to its students without accreditation from CODA.  One of CODA's requirements is that IME must be accredited through a USDOE-approved accrediting agency.  As a result of WASC's actions, IME lost that accreditation on October 26, 2010.  As such, CODA has informed IME that it intends to withdraw its accreditation of IME's dental hygiene program unless IME can show that it is accredited by a USDOE-approved accrediting agency by February 2, 2012.

26.    If IME loses CODA's accreditation, it will lose its Dental Hygiene Program, and will, without a doubt, face numerous student lawsuits, since its Dental Hygiene students now may

1   not graduate from an accredited school.  Eleven of IME's Dental Hygiene students have already

2   dropped out of the program as a result of this accreditation issue.

3         27.   The inevitable loss of IME's Dental Hygiene Program, as well as its other

4   programs, will be catastrophic for the school.  Not only will the school have substantial damages

5   as a result of the loss of student income, but it will also incur millions of dollars in damages as a

6   result of real estate space and equipment that it procured in reliance on WASC ACS's assurances

7   that IME was accredited through 2016,  which it will now be unable to use.  In addition, IME will

8   suffer substantial damages as a result of the inevitable lawsuits that students will file against IME.

9   Moreover, IME's reputation and goodwill will be irreparably damaged, which will result in the

10   inability to attract future students.

11         28.   Although IME is attempting to obtain accreditation through alternate agencies on

12   an emergency basis, all of the accrediting agencies that it has contacted, have informed IME that

13   the accreditation process will take approximately two years.  If IME is forced to wait two years to

14   obtain accreditation, it will result in a loss of most, if not all, of its programs.

15         29.   WASC ACS's illegal and capricious actions have already caused, and continue to

16   cause, irreparable harm to IME.  Through no fault of its own, IME may lose its students, faculty,

17   and, ultimately, its entire business.

18         30.   WASC ACS's actions have also caused irreparable harm to IME's reputation and

19   goodwill.  This damage to IME's reputation is causing students to leave the school and is

20   dissuading new students from enrolling.

21   **FIRST CAUSE OF ACTION**

22   **Denial of Common Law Due Process**

23         31.   IME incorporates the preceding allegations as if set forth fully herein.

24         32.   Private accreditation agencies must afford due process to member institutions

25   under federal common law. *Auburn Univ. v. Ass'n of Colleges and Schools*, 489 F. Supp. 2d

26   1362, 1372 (N. D. Ga 2002) ("[W]here membership in private associations is a 'virtual

27   prerequisite' to the practice of a given profession, courts must scrutinize the procedures used by

28   the association to assure that they are reasonable"); *see also* 20 U.S.C. § 1099b(a)(6) (accreditor

1    "shall apply procedures throughout the accrediting process, including evaluation and withdrawal

2    proceedings, that comply with due process . . . ."); 34 C.F.R. §§ 602.18, 602.25.

3          33.     Private accreditation agencies must, among other things, refrain from making

4    decisions that are arbitrary and capricious. *See Florida College of Business v. Accrediting*

5    *Council for Ind. Colleges & Schools*, 954 F. Supp. 256, 258 (S.D. Fla. 1996) (federal courts will

6    review an action by an accrediting agency to determine "whether the [agency's] decision was

7    arbitrary and unreasonable," and whether it has followed its rules in reaching its decision); *see*

8    *also* 20 U.S.C. § 1099b(f) (providing exclusive federal jurisdiction for disputes between an

9    educational institution and recognized accrediting agencies).[1]

10          34.     In providing due process to educational institutions, accrediting agencies must also

11    provide, among other things, particularized notice of rights at stake and allegations to be

12    answered, and a meaningful opportunity to be heard.

13          35.     The amount and degree of process due to an institution under the common law

14    varies according to the importance of the action being considered by the accrediting body.  The

15    more the institution stands to lose, the more process it is entitled to receive.  Where an

16    educational institution's "entire future rests on [an accrediting body's] decision" whether to retain

17    the educational institution's accreditation status, as is the case here, the institution's "need for due

18    process could not be stronger." *Edward Waters College, Inc. v. Southern Ass'n of Colleges and*

19    *Schools, Inc.*, 2005 U.S. Dist. LEXIS 39443, *18 (M.D. Fla. Mar. 11, 2005).

20          36.     WASC ACS's decision to withdraw from the USDOE's Title IV compliance

21    process altered IME's accreditation status in that it rendered the accreditation that WASC ACS

22    provided to IME meaningless. As such, for the reasons discussed above, it will likely be IME's

23    death knell and, therefore, IME's "need for due process" could not be stronger.

24          37.     WASC ACS's decision to withdraw from the USDOE's Title IV compliance

25    process, violated IME's due process rights on at least the following grounds:

26              a.    WASC ACS's action with respect to the Title IV compliance process was

27

---

28    [1] Although the WASC ACS is no longer recognized by the USDOE, it was USDOE-recognized at the time it took the actions in question.

1    capricious and unreasonable.

2         b.   WASC ACS altered IME's accreditation status without providing meaningful

3              notice and an opportunity to be heard.

4         c.   WASC ACS failed to follow its own procedures and regulations, which

5              provide for a right to appeal adverse decisions regarding accreditation.

6    38.   As a result of WASC ACS's actions, IME has been and will continue to be

7    irreparably harmed by WASC ACS's violations of its common law due process obligations.

8    Consequently, IME is entitled to damages, and such other relief as this Court deems proper, as a

9    result of the loss of its accreditation status, the loss of its goodwill and reputation, the loss of its

10   students, the loss of its faculty, and the loss of its programs, in an amount to be proven at trial.

11                              **SECOND CAUSE OF ACTION**

12                                  **Breach of Contract**

13   39.   IME incorporates the preceding allegations as if set forth fully herein.

14   40.   By applying to receive accreditation from WASC ACS and WASC ACS's

15   agreement to certify IME as an accredited institution, IME and WASC ACS formed a valid

16   contract. *Dannhausen v. Business Publications Audit of Circulation, Inc.*, 797 F.2d 548, 552 (7th

17   Cir. Ill. 1986) ("Association by-laws are in the nature of contracts among associations and

18   members, and conduct that violates by-laws is akin to a breach of contract."); *Koefoot v.*

19   *American College of Surgeons*, 692 F. Supp. 843, 860 (N.D. Ill. 1988) ("[M]embers of voluntary

20   associations and the associations themselves are contractually bound to follow the bylaws, rules,

21   and regulations of the association. By joining the association, a member accepts this obligation as

22   a condition of membership. By accepting the member into the association, the association accepts

23   this obligation as a limitation on its ability to impair the member's status."); *Career Care Inst.,*

24   *Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.*, 2009 U.S. Dist. LEXIS 45784 (E.D. Va.

25   Mar. 24, 2009) (holding that state law claims, like breach of contract, are not preempted by the

26   Higher Education Act).  The contract between IME and WASC ACS guaranteed IME, subject to

27   certain enumerated duties incumbent on IME, six years of accreditation.  Nothing in WASC's

28   rules and procedures, including its Constitution, provide for early termination of an institution's

accreditation status by WASC, other than for an accredited institution's failure to comply with ongoing accreditation requirements. At no time did IME fail to satisfy its obligations. As such, WASC ACS had an obligation to continue to provide IME accreditation through 2016.

41.     In addition, WASC's Constitution reads as follows:

> "If an institution, after availing itself of any review or appeal procedures of its Accrediting Commission, still believes itself aggrieved by that Accrediting Commission's denial or termination of candidacy or accreditation, its governing board, through formal authorization to its chair, may appeal such action within thirty (30) calendar days of receipt of notice thereof of the final Accrediting Commission action by filing an appropriate notice of appeal to the President of the Association through the affected Accrediting Commission's Chief Executive Officer."

WASC failed to adhere to this provision of its Constitution in that it did not provide IME with the opportunity to appeal or have reviewed WASC ACS's decision to withdraw from the USDOE's Title IV compliance process. Rather, WASC ACS unilaterally took an action that negatively impacted IME, but did not provide IME with the right or ability to attempt to prevent that adverse action before it happened.

42.     In addition, IME was provided with a letter from WASC ACS on June 7, 2010, which stated that WASC ACS was "granting the Institute of Medical Education a six-year term of accreditation, expiring on June 30, 2016." **See Exh. A.** This letter constitutes an express contract between IME and WASC ACS. IME received a second letter from WASC ACS dated September 23, 2010, verifying its accreditation status. **See Exh. B.** The only caveats to this accreditation were that IME had to "maintain compliance with the ten (10) WASC standards required of post-secondary institutions," and it had to submit an annual report to WASC ACS verifying compliance. **See Exh. A.** At all times prior to October 26, 2010, IME satisfied both of these requirements.

43.     As a direct and proximate result of these breaches of contract, IME has incurred substantial damages and will continue to incur substantial damages including, among other things, a loss of present and future Title IV Program funding, damage to its reputation, loss of good will, a loss of students, a loss of faculty, and the potential loss of its entire business in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith And Fair Dealing**

44.     IME incorporates the preceding allegations as if set forth fully herein.

45.     California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

46.     As a result of the actions of WASC ACS, set forth hereinabove, WASC ACS has violated the implied covenant of good faith and fair dealing pertaining to the above referenced contracts. As a result thereof, entitled to damages as prayed.

47.     As a direct and proximate result of this breach of the implied covenant of good faith and fair dealing, IME has incurred substantial damages and will continue to incur substantial damages including, among other things, a loss of present and future Title IV Program funding, damage to its reputation, loss of good will, a loss of students, a loss of faculty, and the potential loss of its entire business in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**Intentional Interference With Contract (Student Enrollment Agreements)**

48.     IME incorporates the preceding allegations as if set forth fully herein.

49.     By granting accreditation to an educational institution, WASC ACS enables that institution to enter into contracts or other business relationships with students that provide for their enrollment in accredited programs.

50.     IME has entered into an enrollment contract with each of its students. This contract sets forth the reciprocal rights and responsibilities of the school and each student, including the responsibility of students to pay tuition, and informed students that they would be graduating from an accredited institution. Students entered into such enrollment contracts based in large part on the fact that IME was accredited by an accrediting agency officially recognized by the USDOE. That accreditation status, permitted IME to receive accreditation from the various filed-related accrediting agencies (such as CODA), which, in turn, allowed IME to offer accredited programs to its students. If IME's students are not able to graduate from accredited programs, their tenure as a student at IME is rendered meaningless, as they will likely not be able

1    to obtain jobs, since most employers require graduation from an accredited institution.

2        51.    WASC ACS had knowledge of IME's agreements with its students.

3        52.    WASC ACS knew that IME's ability to maintain its relationship with students

4    depended on its ability to maintain its accreditation status.

5        53.    By terminating its relationship with the USDOE, WASC ACS intentionally

6    interfered with IME's contractual relationships with its students.

7        54.    As a direct and proximate result of this intentional interference with contractual

8    relationships of which WASC ACS had knowledge, IME has incurred substantial damages and

9    will continue to incur substantial damages, including, among other things, a loss of current and

10   future students with their concomitant tuition payments, a loss of meaningful accreditation,

11   damage to its reputation, loss of goodwill, and the potential loss of its entire business, in an

12   amount to be proven at trial.

13                          **FIFTH CAUSE OF ACTION**

14       **Negligent Interference With Prospective Business Or Economic Advantage**

15       55.    IME incorporates the preceding allegations as if set forth fully herein.

16       56.    IME had and has economic relationships with prospective students of the school.

17   These relationships had/have a reasonable probability of future economic benefit to IME.

18       57.    WASC ACS knew that IME desired to attract new students, who would enter into

19   enrollment contracts with the school, and pursuant to those contracts, pay tuition.  That is, WASC

20   ACS knew of IME's relationships with prospective students and was aware or should have been

21   aware that if it did not act with due care, its actions would interfere with these relationships and

22   cause IME to lose in whole or in part the probable future economic benefit or advantage of the

23   relationship.

24       58.    WASC ACS's negligent alteration of IME's accreditation status without due

25   process has caused or will cause future students to not enroll with IME.  Absent WASC ACS's

26   withdraw from its relationship with the USDOE, IME's prospective students would have entered

27   into enrollment contracts, and pursuant to those contracts, paid tuition.

28       59.    As a direct and proximate result of this negligent interference with contractual

11

relationships, IME has incurred substantial damages and will continue to incur substantial damages, including, among other things, a loss of current and future students with their concomitant tuition payments, a loss of meaningful accreditation, a loss of Title IV funding, damage to its reputation, loss of goodwill, and the potential loss of its entire business, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Promissory Estoppel

60.     IME incorporates the preceding allegations as if set forth fully herein.

61.     Beginning in July 2010 (*see* **Exh. A**), WASC ACS made a promise to IME through oral and written representations that it would accredit IME through 2016. At the time those promises were made, WASC ACS was a USDOE-approved accrediting commission. In September 2010, WASC ACS provided additional verification that all of IME's programs were accredited by WASC.

62.     WASC ACS should have reasonably expected IME to rely on this promise.

63.     IME did in fact justifiably rely on WASC ACS's promise by 1) continuing to offer its already-existing programs to its students; 2) continuing to accept new students; 3) signing a lease for rental space to accommodate its new programs; 4) purchasing equipment for its new programs; and 5) informing its students, faculty, and field-related accrediting agencies, such as CODA, that it IME was accredited by a USDOE-approved accrediting agency through 2016.

64.     Had IME been given adequate advance notice that WASC ACS intended to withdraw from the USDOE's Title IV compliance process, it could have (and would have) sought accreditation from an alternate accreditation agency. Instead, it spent approximately a year engaging in the accreditation renewal process with WASC ACS in reliance on its representations that it was a USDOE-approved accrediting agency. As such, WASC ACS is estopped from taking any action that was contrary to the oral and written representations that it made to IME regarding its accreditation status.

65.     As a result of WASC ACS's actions, as of October 26, 2010, IME was no longer accredited by a USDOE-approved accrediting agency. Without accreditation from a USDOE-

12

1   approved accrediting agency, IME cannot continue to run its school.

2          66.     As a direct and proximate result of WASC ACS's false promises, IME has

3   incurred substantial damages and will continue to incur substantial damages, including, among

4   other things, a loss of current and future students with their concomitant tuition payments, a loss

5   of meaningful accreditation, a loss of Title IV funding, damage to its reputation, loss of goodwill,

6   and the potential loss of its entire business, in an amount to be proven at trial.

7                              **PRAYER FOR RELIEF**

8          WHEREFORE, IME demands a jury trial on all counts and asks for judgment:

9          (1)     Awarding IME damages in an amount to be determined at trial, including

10   compensatory and consequential damages as well as pre-judgment and post-judgment interest;

11          (2)     Awarding IME punitive damages in an amount to be determined at trial;

12          (3)     Awarding IME its attorneys' fees and other costs and expenses of this litigation;

13          (4)     Ordering WASC to restore IME's accreditation status as it was prior to October

14   26, 2010, by requiring that WASC's accredit IME through its Accrediting Commission for

15   Community and Junior Colleges (which is recognized by the USDOE); and

16          (5)     Granting such other and further relief as the Court deems just and equitable on all

17   counts.

18

19   Dated:    November 30, 2011          FOX, WANG, & MORGAN P.C.

20

21                                      By: _Alexa Morgan_
22                                          John C. Fox
                                            Alexa L. Morgan
23                                          *Attorneys for Plaintiff*
                                            THE INSTITUTE OF MEDICAL EDUCATION
24

25

26

27

28

13